Filed 7/9/26  P. v. Martin CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

| | |
|---|---|
| THE PEOPLE,<br>        Plaintiff and Respondent,<br><br>        v.<br><br>EUGENE JAMES MARTIN,<br>        Defendant and Appellant. | C101325<br><br>(Super. Ct. Nos. STK-CR-FE-1993-0006586, SC056415A) |

Defendant Eugene James Martin appeals from the trial court's denial of his petition for resentencing under Penal Code section 1172.6[1] following an evidentiary hearing.  Appellate counsel filed a brief raising no arguable issues under *People v. Wende* (1979) 25 Cal.3d 436 and *People v. Delgadillo* (2022) 14 Cal.5th 216.[2]  Counsel notified Martin that he had 30 days to file a supplemental brief raising issues he wished this court to consider.  Martin filed a supplemental brief raising two concerns.

---

[1]  Undesignated statutory references are to the Penal Code.

[2]  Appellate counsel contends this appeal should not be limited to the review process of *Delgadillo*, since it follows an evidentiary hearing.  Rather, counsel contends we should independently review the record for error pursuant to *Wende*, inviting this court to distinguish this case from *Delgadillo*, which was decided at the prima facie stage.  We decline the invitation to determine *Delgadillo*'s scope.  Instead, as in *Delgadillo*, we exercise our discretion to independently review the record.

1

After considering Martin's contentions and independently examining the record, we affirm.

## BACKGROUND

A.     *The Underlying Crime*

On September 1, 1993, 70-year-old Charlotte got into her car in the parking lot of the Department of Motor Vehicles (DMV), rolled down her driver's side window, and put her purse on the passenger's seat. As she reached into her glove box, two Black men appeared in her driver's side window. One of them had bare shoulders covered only in a "wide black band." He reached behind Charlotte and took her purse. At trial, witnesses identified Martin as the man who took Charlotte's purse. The two men ran away. Terrified, Charlotte got out of the car and started screaming.

Charlotte approached a man in the parking lot, George, who was driving with his 17-year-old stepson in the passenger seat. Charlotte told George what happened; he turned his car around and drove after the two men. As he drove, a yellow Oldsmobile pulled in front of him. He followed the Oldsmobile to a stop sign at the intersection of California and Flora Streets. Both cars stopped; George told his stepson to get the license plate number.

At the stop sign, a Black man wearing a T-shirt and pants got out of the Oldsmobile holding a gun; George told his stepson to "get down" and put his car in reverse. As George started to drive backward, the man began shooting. George could see the gun was a revolver, maybe a .357-caliber, and the shooter was looking right at him. The first shot struck the passenger side windshield of George's car and wounded his stepson in the shoulder. George heard three more shots hit the front of his car.

Out of the corner of his eye, George saw a DMV security guard running. George also saw the man who was shooting at him turn his gun toward the security guard and fire a single shot. The security guard fell to the ground with a bullet wound in his abdomen. George estimated the entire incident lasted a "couple minutes maybe, if that long."

2

George's stepson was taken away in an ambulance; George gave the responding police officers a description of the Oldsmobile, including the license plate number.

That same day, Linda was at work when she heard "a lot of loud squealing." She looked up and saw a yellow Oldsmobile "hit the corner right there on Fremont and Edison" and three Black men jump out. The first man wore a white T-shirt and was holding a gun; she saw him drop the gun on the sidewalk as he ran. The second man, wearing a striped pullover, ran in the same direction as the first but toward the nearby homes. The third man who jumped out of the car had pants on but no shirt; he also was carrying a gun. He ran toward a fenced area of the nearby homes, dropped the gun by a chain link fence, and ran toward a vacant lot at the back of the homes.

Debbie worked with Linda. She also heard loud squealing and looked up to see a yellow Oldsmobile "spinning in the intersection of Edison and west Fremont and three gentlemen exiting the car." The driver wore a white T-shirt and carried a gun in his hand. He threw the gun down near the sidewalk and took off running. Debbie saw a second man, wearing "blue jeans" and no shirt, get out of the passenger side of the car. He was also carrying a gun. Debbie watched him run toward a vacant lot where he threw the gun in the dirt, close to a chain link fence, then run toward the homes near the vacant lot. The third man to get out of the car was wearing "something blue"; he too ran toward the nearby homes.

Police Officer Douglas Haro responded to the report of a shooting at the DMV. The report included the description of a yellow Oldsmobile involved in the shooting. Officer Haro saw a car matching that description and followed it at intermittently high rates of speed until it stopped in the middle of the road near the intersection of Fremont and Edison Streets and three Black men ran from the car. One of the men was wearing jeans but no shirt; another was wearing a blue shirt with a blue baseball cap; the third was wearing a white T-shirt. The man in the T-shirt ran one direction; the other two men ran

3

in a different direction.  At trial, Officer Haro identified Martin as the man wearing jeans and no shirt.

Officer Haro jumped out of his patrol car and chased Martin.  Martin jumped several fences while running from the officer, running in and out of the officer's sightline.  During the chase, Officer Haro saw Martin run into and out of a residence.  As Martin came out of the residence, he was arrested.  Martin was no longer wearing jeans or shoes.

While investigating the scene at Edison and Fremont Streets, police officers found a .32-caliber automatic handgun next to a chain link fence with one round in the chamber and another in the magazine, as well as a Smith & Wesson .357 magnum handgun in the dirt just south of the first gun.  Inside the cylinder of the Smith & Wesson, they found six "spent casings" indicating the gun had been fired.  Both guns were operational.  They also found a pair of shoes in a vacant lot near the handguns.

Officers searched the Oldsmobile and found a pair of blue denim overalls in the backseat, which witnesses identified at trial as the same overalls they saw Martin wearing the day of the robbery and shooting.  They also found a piece of paper with Martin's thumbprint on it.  At the intersection where the shooting took place, police officers found four empty shell casings from a .380-caliber pistol, and one expended bullet consistent with a .357 magnum.

Several days later, a private citizen who lived on Edison Street found a .380-caliber pistol in his back yard, near a chain link fence.  The gun was operable, but it was jammed; a full magazine sat beneath it.  He turned the gun over to the police immediately.

B.    *Trial, Sentencing, and Prior Appeal*

The jury found Martin guilty of robbery, finding also that he knew or should have known the victim was vulnerable (§§ 211, 667.9, subd. (a)), and three counts of attempted, willful, deliberate, premeditated murder (§§ 664, 187).  In a bifurcated

4

proceeding, the trial court found Martin served a prior prison term (former § 667.5, subd. (b)) and was previously convicted of three serious felonies (§ 667, subd. (a)). The court sentenced him to life in prison for each count of attempted, premeditated murder. For the robbery, the court imposed five years plus one year for the vulnerable victim enhancement. (§ 667.9, subd. (a).) The court also imposed one year for the prior prison term (§ 667.5, subd. (b)) and five years each for the three prior convictions (§ 667, subd. (a)). In sum, the court sentenced Martin to prison for 22 years plus three life terms.

Martin appealed, arguing that the evidence was insufficient to support his convictions and his life terms must run concurrent with one another as a matter of law. In *People v. Martin* (Mar. 18, 1996, C018510 & C020507) (nonpub. opn.), this court found the evidence sufficient to support Martin's convictions but agreed the life terms were to be served concurrently. After modifying the sentence accordingly, we affirmed the convictions in full.

### C.     *Petition for Resentencing*

In September 2021, Martin filed a form petition for resentencing under what is now section 1172.6 (former section 1170.95) asserting he could no longer be convicted of attempted murder based on subsequent changes to the murder statutes. The trial court issued an order to show cause for an evidentiary hearing.

At the evidentiary hearing, the trial court admitted as evidence the record of conviction including the trial transcript, the preliminary hearing transcript, and the clerk's transcript from the prior appeal. The court noted it would consider the preliminary hearing transcript as evidence except for any "Prop 115 hearsay." Neither side presented new evidence.

Considering the evidence as an independent trier of fact, the trial court found the evidence showed, beyond a reasonable doubt, that Martin aided and abetted in the attempted murder of three people. The court denied Martin's petition.

5

Martin timely appealed in June 2024. Appellate counsel filed an opening brief on September 9, 2025, and the People filed their response on January 23, 2026. On February 23, 2026, appellate counsel filed a motion to strike the opening brief and file a replacement brief; this court granted that motion and on March 11, 2026, counsel filed a *Wende/Delgadillo* brief. On March 16, 2026, Martin filed his supplemental brief; the matter was deemed fully briefed that same day.

DISCUSSION

A.    *Applicable Law*

Effective January 1, 2019, Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill No. 1437) amended "the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f); see *People v. Lewis* (2021) 11 Cal.5th 952, 959.) Senate Bill No. 1437 amended sections 188 and 189.

Section 188, subdivision (a)(3), now provides: "Except as stated in subdivision (e) of section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." Section 189, subdivision (e)(1)-(3), in turn, now provides: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."

6

Senate Bill No. 1437 also created a procedural mechanism in section 1172.6 for those convicted under the former law to seek retroactive relief under the law as amended. (*People v. Lewis*, *supra*, 11 Cal.5th at p. 957.) Senate Bill No. 775 (2021-2022 Reg. Sess.) later expanded the statute to apply to attempted murder under the natural and probable consequence doctrine and manslaughter. (Stats. 2021, ch. 551, § 2.)

Under section 1172.6, if a petitioner files a facially sufficient petition and makes a sufficient prima facie showing he or she is entitled to relief (§ 1172.6, subds. (a)-(c)), the trial court must issue an order to show cause and conduct an evidentiary hearing where the prosecution bears the burden of proving beyond a reasonable doubt petitioner could still be convicted of murder (or attempted murder) under current law (§ 1172.6, subds. (c), (d)).

At the evidentiary hearing to determine whether the petitioner is entitled to relief, the admission of evidence is "governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed." (§ 1172.6, subd. (d)(3).) The court may also consider the procedural history of the case recited in any prior appellate opinion. (*Ibid*.) Hearsay evidence admitted in a preliminary hearing pursuant to subdivision (b) of section 872 must be excluded from the hearing as hearsay unless the evidence is admissible under another exception to the hearsay rule. (§ 1172.6, subd. (d)(3).) Both the prosecutor and the petitioner may offer new or additional evidence to meet their respective burdens. (*Ibid*.)

B.     *Discussion*

Martin first argues that appellate counsel failed to include eyewitness testimony from the preliminary hearing in their opening brief. We exercised our discretion to review the entire record on appeal. Accordingly, whether counsel failed to include relevant testimony from the preliminary hearing in their opening brief is irrelevant

because we reviewed the transcript from the preliminary hearing. We thus considered all the relevant, admissible testimony.

Next, Martin claims the trial court said it would not rely on the preliminary hearing transcript to reach its decision. On the contrary, the trial court specifically said, except for "any Prop 115 testimony," it considered the preliminary hearing transcript in reaching its decision.

After considering the arguments raised in Martin's supplemental brief, and having independently reviewed the record, we conclude no arguable error would result in a disposition more favorable to him.

## DISPOSITION

The order denying Martin's petition for resentencing under section 1172.6 is affirmed.


/s/
BOULWARE EURIE, J.

We concur:


/s/
KRAUSE, Acting P. J.


/s/
MESIWALA, J.


8